UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HOWARD LINDEN as personal
representative of the ESTATE OF
FRANCIS CZAPLICKI, deceased,
     Plaintiff,

v.                                      Case No. 03-71479

HARDING TUBE CORP.,              Honorable Patrick J. Duggan
     Defendant/Third-Party Plaintiff/
     Third Party Counter-Defendant,

v.

ADP COBRA SERVICES, INC.,
     Third-Party Defendant/Third Party
     Counter-Plaintiff.
_____/

**OPINION**

On April 15, 2003, Francis Czaplicki ("Mr. Czaplicki") filed this lawsuit under

Section 1132(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"),

as amended by the Consolidated Omnibus Budget Reconciliation Act of 1985

("COBRA"), 29 U.S.C. §§ 1161-69.  Mr. Czaplicki claimed that his former employer,

Defendant Harding Tube Corporation ("Harding Tube"), failed to timely notify him of his

rights to continued medical insurance coverage and therefore prevented him from

receiving coverage under COBRA.[1]  As damages, Mr. Czaplicki sought to recover the

_____

[1]In late November 2003, Mr. Czaplicki passed away and Howard Linden was
appointed as personal representative of his estate.  Mr. Linden subsequently moved for
substitution of party, which this Court granted on April 30, 2004.  For ease of reference,

amount he owed Huron Valley Hospital for medical services the hospital provided during

a period when Mr. Czaplicki would have received COBRA coverage.  Harding Tube filed

a third-party complaint against ADP COBRA Services, Inc. ("ADP"), seeking to recover,

by way of indemnification, the damages awarded to Mr. Czaplicki and other "costs,

expenses, and reasonable attorney fees suffered by Harding Tube as a result of . . . ADP's

failure to pay over to Harding Tube the premiums for COBRA continuation coverage

relating to Mr. Czaplicki . . . ."  *See* 10/18/05 Joint Final Pretrial Order ¶ 2.  ADP denies

that it failed to fulfill its obligation to Harding Tube under the "COBRA Service

Agreement" between the parties and it filed a third-party counter-complaint against

Harding Tube "to recover its costs and attorney fees under the indemnification provisions

of the COBRA Service Agreement."  *See id*. ¶ 3.

## I.      Factual and Procedural Background

Harding Tube first employed Mr. Czaplicki in 1989.  Mr. Czaplicki worked for

Harding Tube on and off for several years.  After May 15, 2001, Mr. Czaplicki failed to

report for work.  However, due to his prior work history, Harding Tube only terminated

Mr. Czaplicki's employment on June 15, 2001, when he still had not returned to his

position.  Harding Tube continued to carry Mr. Czaplicki under its medical and dental

coverage until June 30, 2001.  Coverage under Harding Tube's medical plan was

provided under the Selectcare Health Maintenance Organization Group Medical

Insurance Plan ("Selectcare").

―――――――――――――――――

however, the Court will refer to Plaintiff as Mr. Czaplicki.

On July 26, 2001, Mr. Czaplicki was admitted to Huron Valley Hospital ("hospital"). The hospital uses a company called MedAssist, Inc. ("MedAssist") to help its patients qualify for Medicaid or obtain insurance coverage. Upon learning that Mr. Czaplicki had not been offered COBRA benefits from his former employer, MedAssist sent a generic election form to Harding Tube by facsimile on August 29, 2001. This form indicates that Mr. Czaplicki wishes to elect COBRA continuation coverage and requests COBRA election notification and any other related correspondence to be sent to MedAssist.

Pursuant to a "COBRA Service Agreement" executed on July 1, 1995, ADP provides COBRA administration services for Harding Tube.[2] Therefore after receiving MedAssist's August 29 facsimile, Harding Tube sent ADP a COBRA transmittal form via facsimile indicating that Mr. Czaplicki's employment terminated on June 15, 2001, he previously received medical and dental coverage, and he wanted to continue his insurance through COBRA. Harding Tube also provided ADP with the name and address of Mr. Czaplicki's COBRA representative, MedAssist.

ADP sent a notice to Mr. Czaplicki at MedAssist's address on November 7, 2001, offering him continued dental and medical coverage. ADP also included a payment coupon, requiring payment in the amount of $1,016.60 by December 1, 2001, for COBRA coverage for the period of July 1 through November 30, 2001. By certified mail, MedAssist sent ADP a check in the amount of $632.68 to provide medical coverage for

---

[2]Harding Tube's initial COBRA service agreement was with Cobra Administrative Services ("CAS"). ADP is the successor to CAS.

3

Mr. Czaplicki from July 1 through September 30, 2001.[3]

The terms of the COBRA Service Agreement between ADP and Harding Tube required ADP to receive all COBRA premiums from beneficiaries and then, once their payments cleared, to forward all premiums to Harding Tube for payment to Harding Tube's healthcare provider. *See* Harding Tube Trial Ex. 1 "Exhibit B" ¶ III.B. Therefore, according to ADP, after it received payment from MedAssist to activate coverage for Mr. Czaplicki from June 30 through September 30, 2001, it deposited MedAssist's payment. ADP claims that, on January 9, 2002, it sent a check (Check No. 118015) for $597.99 to Harding Tube via regular United States mail.[4] Harding Tube claims it never received nor cashed ADP's Check No. 118015. ADP acknowledges that the check never was deposited or cashed. *See* Harding Tube Trial Ex. 10.

On September 28, 2005, this Court issued an Opinion and Order with respect to motions for summary judgment filed by the parties. The Court determined that Harding Tube was obligated to Mr. Czaplicki under ERISA. The Court therefore granted Mr. Czaplicki's motion for summary judgment and awarded Mr. Czaplicki the sum of $62,935.45– the amount the hospital would have accepted from Selectcare as payment in full for its medical services to Mr. Czaplicki. The Court, however, denied Harding Tube's and ADP's motions for summary judgment, finding that a genuine issue of

---

[3]Because Mr. Czaplicki was discharged from the hospital in late September 2001, MedAssist only sought coverage through the end of that month. *See* Pl.'s Mot. Ex. F.

[4]MedAssist sent ADP a check in the amount of $632.68. The amount actually due, however, only was $609.96, representing $597.99 due to Selectcare and a 2% administrative fee charged by ADP. *See* Pl.'s Mot. Ex. 2 Answer to Interrogatory 5. ADP reimbursed MedAssist for the $22.72 overpayment. *See id.*

2:03-cv-71479-PJD   Doc # 50   Filed 07/07/06   Pg 5 of 14   Pg ID 578

material fact existed with respect to whether the actions of ADP or Harding Tube resulted

in Mr. Czaplicki not receiving COBRA continuation coverage.

This Court therefore conducted a bench trial on Harding Tube's and ADP's third-

party claims on November 9, 2005.  At the one-day trial, Thomas Harding testified on

behalf of Harding Tube and Daniele Weaver and Mark Koviac testified on behalf of

ADP.  The parties also introduced numerous documents into evidence.

## II.    Summary of the Case and the Court's Conclusions

In its third-party complaint against ADP, Harding Tube seeks indemnification

from ADP pursuant to the parties' COBRA Service Agreement.  In order to prevail,

Harding Tube must satisfy this Court, by a preponderance of the evidence, that ADP

breached its contractual obligations.  Specifically at issue is Paragraph III.B.3 to Exhibit

B of the agreement which provides that ADP "shall verify that [qualified beneficiaries']

checks have cleared and will forward a[n ADP] check for premiums equal to the

applicable premium to EMPLOYER every two weeks."  *See* Harding Tube Trial Ex. 1

"Exhibit B" ¶ III.B.3.  Pursuant to the agreement, upon receipt of the funds from ADP,

Harding Tube was obligated to forward payment to Selectcare in order to commence Mr.

Czaplicki's COBRA coverage.  It is undisputed that Harding Tube never sent a payment

to Selectcare.

Earlier in this case, ADP contended that the failure to provide COBRA coverage

for Mr. Czaplicki was due to Harding Tube's failure to provide timely notice to ADP of

Mr. Czaplicki's termination.  At this time, however, the Court is satisfied that if Harding

Tube had received the premium payment ADP alleges it sent to Harding Tube on January

9, 2002, Harding Tube could have paid Selectcare in a timely fashion in order to institute the COBRA coverage Mr. Czaplicki elected.  Therefore, the only issue that must be resolved to determine the respective liabilities of these parties as to Harding Tube's third-party complaint is whether ADP breached its obligation to forward the payment it received from MedAssist to Harding Tube.  If ADP fulfilled that obligation, it did not breach its contractual obligation to Harding Tube and judgment will be rendered in favor of ADP.  If ADP breached the obligation to forward the payment to Harding Tube, then ADP is liable to Harding Tube under the COBRA Service Agreement's indemnification provision and Harding Tube will be entitled to judgment against ADP.

With respect to ADP's third-party counter-complaint against Harding Tube, ADP seeks indemnification from Harding Tube for any losses ADP suffers as a result of Mr. Czaplicki's or Harding Tube's claims, including costs and attorney's fees ADP incurred defending against those claims.  The COBRA Service Agreement contains the following indemnification provision:

> [Harding Tube] hereby releases and forever discharges and agrees to indemnify and hold harmless [ADP] . . . from any and all liability, losses, damages, claims, demands, lawsuits, causes of action, costs, and expenses (including without limitation reasonable attorneys' fees and the costs of litigation) which arise out of or are based upon:
>
> (i)    any breach by [Harding Tube] of any of its representations, warranties, covenants or agreements contained herein or the untruth or inaccuracy thereof; and
>
> (ii)   any acts or omissions of [Harding Tube] relating to this Agreement or the obligations to be performed by [Harding Tube].

6

*See* ADP Trial Ex. 102 at 5 ¶ 8(a).  ADP claims that it is entitled to indemnification from

Harding Tube under this provision because Harding Tube failed to perform its obligations

under the COBRA Service Agreement by failing to forward the funds it received from

ADP to Selectcare in order to initiate Mr. Czaplicki's COBRA coverage.  Therefore, to

prevail on its third-party counter-claim against Harding Tube, ADP must prove by a

preponderance of the evidence that Harding Tube in fact failed to perform this obligation

under the agreement.

  For the reasons set forth more fully below, the Court finds that neither party has

met its burden of proving by a preponderance of the evidence that the other party failed to

fulfill its obligations under the COBRA Service Agreement.  The Court therefore finds

against Harding Tube on its third-party complaint against ADP and against ADP on its

third-party counter-complaint against Harding Tube.

## III. Applicable Law

  ADP relies on the common law "mailbox rule" to demonstrate that it mailed Check

No. 118015 to Harding Tube for the premiums necessary to institute Mr. Czaplicki's

COBRA coverage.  As the Sixth Circuit has explained the rule:

> The common law has long recognized a presumption that an
> item properly mailed was received by the addressee . . . The
> presumption arises upon proof that the item was properly
> addressed, had sufficient postage, and was deposited in the
> mail.

*In re Yoder*, 758 F.2d 1114, 1118 (6th Cir. 1985)(internal citations omitted).  If a

presumption of mailing arises, it can be rebutted "upon the introduction of evidence

which would support a finding of the nonexistence of the presumed fact."  *Id*. (citations

omitted).  The addressee's testimony that it did not receive the item allegedly mailed is, standing alone, sufficient to rebut the presumption of mailing.  *Id.*    If the presumption of mailing is rebutted, the fact finder must weigh the evidence to determine whether the party with the burden of proof has met its burden.  *Id.* at 1119-1120 and n.12.

**IV.     Trial Testimony and Analysis**

In order to establish that ADP never sent Check No. 118015 to Harding Tube, as ADP claims it did on January 9, 2002, Harding Tube offered the testimony of Thomas Harding, a co-owner and the Administrative Manager of Harding Tube.  Mr. Harding claimed that he first became aware of the check ADP claims it sent Harding Tube during the course of this litigation.  To demonstrate that Harding Tube never received ADP's check, Mr. Harding testified to the company's procedures for handling incoming mail and his review of Harding Tube's records.

Mr. Harding explained that he or the corporation's front office person, Stacey Lemon, typically open incoming mail.  The mail then is sorted and any checks are removed and copied.  If a letter accompanies a check, the letter and a copy of the check are forwarded to the addressee.  A deposit slip is prepared for any checks received on a particular day and the deposit is made that day or, at the latest, the next business day. Information indicating the receipt of customer checks is entered into Harding Tube's computer system on a daily basis to reflect customer payments.  The copies of the checks are maintained in a monthly file. According to Mr. Harding, Harding Tube has followed this procedure since the beginning of 1999.

Mr. Harding testified that he reviewed the files and records of Harding Tube

8

during this litigation and was not able to locate a copy or record of the check ADP alleges it sent on January 9.

Mr. Harding also testified to Harding Tube's procedure for handling incoming facsimiles. According to Mr. Harding, each of the company's office staff has an incoming box located near the facsimile machine. When a facsimile is received, it is placed in the recipient's "in-box." The recipient then places the facsimile in a relevant file for retention– for example, correspondence from ADP would be kept in a file containing reports, correspondence, etc. . . from ADP.

To demonstrate that ADP sent Check No. 118015 to Harding Tube on January 9, 2002, ADP offered the testimony of Mark Koviac, an ADP Accounting Manager. Mr. Koviac testified to the procedures ADP follows to prepare and mail checks to employers for COBRA premiums. Mr. Koviac explained this process as follows:

> a) a "Premium Distribution Report" ("PDR") table is run early each month which indicates the premiums paid by beneficiaries for the prior month. After reviewing and approving the PDR table, the job is "kicked off" in ADP's data center;
>
> b) using an automated software system referred to as "CASPRO", three documents are generated for each client/employer based on the PDR table: (1) a cover sheet listing the employer's mailing address and ADP's return address; (2) a check made payable to the employer in a specified amount; and (3) a PDR itemizing the sums in the check;
>
> c) all three documents are removed from the printer and copied by an accounting clerk;
>
> d) the copies are filed and retained in banker boxes by date;

9

> e) the accounting clerk then conducts a quality check by
> reviewing each original document to make sure the cover
> sheet, check, and PDR relate to the same client and that the
> amount of the distribution check matches the amount set forth
> on the PDR;
>
> f) if all the documents are accurate, the accounting clerk
> manually places them into an envelope for mailing; and
> finally,
>
> g) the accounting clerk takes the envelopes to ADP's mail
> room where the envelopes are sealed, stamped, and mailed.

While Mr. Koviac was not employed at ADP in January 2002– when ADP contends it

mailed the check to Harding Tube– Mr. Koviac testified that the above procedures were

followed at that time.

Based on his review of ADP's "check run" for January 9, 2002, Mr. Koviac

testified that ADP prepared and transmitted over 600 checks to clients on that date.  He

further testified that the ten checks printed before and the ten checks printed after the

check to Harding Tube– i.e. Check No. 118015–  were cashed by the payees to whom

they were sent.  Through Mr. Koviac, ADP introduced into evidence the PDR printed for

Harding Tube on January 9, 2002, which set forth the amount of payment to be made to

Harding Tube on that date.  *See* ADP Trial Ex. 117.  ADP also introduced into evidence a

copy of the cover sheet and Check No. 118015 that were generated by CASPRO on

January 9, 2002.  *See id*.  The cover sheet lists Tom Harding at Harding Tube Corporation

as the addressee, Harding Tube's mailing address, and ADP's return address.  *See id*.  Mr.

Koviac testified that ADP retains records with respect to premiums sent to employers that

are returned to ADP as undeliverable and that there was no record of the above items ever

10

being returned.

Based on Mr. Koviac's testimony and ADP's documentary evidence, this Court finds that ADP is entitled to a presumption that it mailed Check No. 118015 to Harding Tube on January 9, 2002.  On the other hand, the Court believes that Harding Tube sufficiently rebutted the presumption of mailing through Mr. Harding's testimony that Harding Tube never received ADP's check.  *See Yoder, supra.*  Therefore, pursuant to *Yoder*, the Court must weigh the evidence to determine whether the party with the burden of proof– Harding Tube with respect to its third-party complaint and ADP with respect to its third-party counter-complaint– has met its burden.

As set forth previously, Harding Tube and ADP have the burden of proving their claims by a preponderance of the evidence.  This standard has been properly defined as "such evidence as, when considered and compared with that opposed to it, has more convincing force and produces in [the trier of fact's] mind belief that what is sought to be proved is more likely true than not true."  *Williams v. Eau Claire Public Sch.*, 397 F.3d 441, 446 (6th Cir. 2005)(providing that this instruction by the trial court  on the "preponderance of the evidence" standard "accurately and adequately instructed the jury" as to the burden of proof).  Stated differently, the standard means the following:

> . . .the plaintiff has to produce evidence which, considered in
> the light of all the facts, leads [the trier of fact] to believe that
> what the plaintiff claims is more likely true than not.  To put it
> differently, if [the trier of fact] were to put the plaintiff's and
> the defendant's evidence on opposite sides of the scales, the
> plaintiff would have to make the scales tip somewhat on his
> side.  If the plaintiff fails to meet the burden, the verdict must
> be for the defendant.

11

1 Fed. Jury Prac. & Instr. Ch. 4 Appendix E (6th Ed.); *see also Gjinaj v. Ashcroft*, No. 03-

3010, 2005 WL 221522, at *8 (6th Cir. Jan. 31, 2005)(unpublished op.)(providing that the

preponderance of the evidence standard "requires only that [the plaintiff]'s evidence

'make the scales tip slightly' in its favor.")

      With respect to Harding Tube's claim against ADP, while the Court finds Mr.

Harding's testimony sufficient to rebut the presumption of mailing, it does not find his

testimony sufficiently compelling to demonstrate that it "is more likely true than not true"

that ADP failed to mail the check in question to Harding Tube.  First, the procedure for

handling incoming checks that Mr. Harding described appears to apply to customer

checks rather than other checks received by the business.  For example, Mr. Harding

specifically described how checks were entered into the company's computer database in

order to keep track of "customer payments" and that its records "reflect an up-to-day

listing of what each customer has outstanding."  He subsequently explained that as a

small company, Harding Tube's cash-flow was "very critical" and it had to be concerned

with its customer relationships and therefore it was important for the company to deposit

"customer checks" immediately.  Mr. Harding did not specifically describe the manner in

which non-customer payments were handled or recorded; nor did he state that any

urgency was taken to deposit such checks.  Thus, while Mr. Harding reviewed the files

and records of Harding Tube to determine whether the company had received a check

from ADP, the Court is not convinced that Harding Tube would have a record of the

check.

      Second, while Mr. Harding testified to the procedures Harding Tube followed with

respect to incoming mail and facsimiles– including the practice of keeping copies of

correspondence in files– it was demonstrated at trial that ADP sent documents to Harding

Tube via the mail or facsimile which Harding Tube failed to produce during discovery

when asked to produce all documents in its possession relevant to the lawsuit.  *See* ADP

Trial Ex. 120 & 122.  For example, ADP introduced a document that it sent to Harding

Tube on October 1, 2001, seeking an updated address for Mr. Czaplicki. *See id*. Ex. 108.

The Court can conclude that Harding Tube actually received this document, as Mr.

Harding wrote a response to ADP directly on the document and then apparently sent the

document back to ADP via facsimile.  *See id*.  Yet this document, along with facsimiles

ADP sent Harding Tube on October 26, November 9, and December 12, 2001, as well as

on January 2, 2002, apparently were not retained by Harding Tube as they were not

produced in response to ADP's requests for any documents relating to Mr. Czaplicki or

this lawsuit. *See id*. Ex. 120 & Ex. 122.  Notably, Mr. Harding testified that Harding

Tube does not have a policy setting forth a time limit for retaining documents and that

any documents received by ADP still should be in Harding Tube's files.  It therefore does

not appear to the Court that Harding Tube processed documents it received in the manner

or as carefully as Mr. Harding described.

Therefore, the Court concludes that Harding Tube has not shown by a

preponderance of the evidence that ADP breached the parties' COBRA Service

Agreement.  The Court therefore finds in favor of ADP with respect to Harding Tube's

claims against ADP.

While the Court does not believe that Harding Tube has met its burden of proof

with respect to its third-party complaint against ADP, the Court also does not believe that ADP has met its burden of proof with respect to its third-party counter-complaint against Harding Tube. Stated differently, after considering all the evidence presented at trial, the Court does not find it more likely true than not true that ADP sent Check No. 118015 to Harding Tube; nor does the Court find it more likely true than not true that Harding Tube actually received Check No. 118015 and then failed to forward payment to Selectcare.

Supporting Harding Tube's claim that it never received ADP's check is the fact that the check never was cashed or deposited. According to Mr. Harding, typically only he or Stacey Lemon handle incoming mail at Harding Tube. The Court finds it hard to believe that a company– particularly one claiming that its cash-flow is "very critical"– simply would disregard or misplace an incoming check. Pursuant to the COBRA Service Agreement, Harding Tube only was obligated to pay Selectcare upon receipt of premiums from ADP. Because the Court does not find it more likely true than not true that Harding Tube received the premium payment, ADP has failed to establish its claim for costs and attorney's fees by a preponderance of the evidence. The Court therefore concludes that Harding Tube is entitled to judgment in its favor with respect to ADP's third-party counter-claim for indemnification.

A Judgment consistent with this Opinion shall issue.

DATE: July 7, 2006                              s/PATRICK J. DUGGAN
                                       UNITED STATES DISTRICT JUDGE


Copies to:
Douglas A. Firth, Esq.
James E. Brenner, Esq.
Mark T. Nelson, Esq.